**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| CARRIE WALKER | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| V. | § | CIVIL ACTION NO. _____ |
| | § | **[Jury Demanded]** |
| MATHESON TRI GAS, INC. | § | |
| *Defendant.* | § | |

---

**PLAINTIFF'S ORIGINAL COMPLAINT**

---

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff, Carrie Walker complaining of Matheson Tri Gas, Inc. ("Defendant" and/or "Matheson"), setting forth grounds for his Original Complaint and for cause would show as follows:

**I.**
**PARTIES**

1.     Plaintiff, Carrie Walker, is a resident of the State of Texas.

2.     Defendant, Matheson Tri Gas, Inc. ("Defendant") is a foreign for-profit corporation with its principal place of business located in New Jersey and conducting business in the State of Texas. Defendant may be served with summons through its registered agent CT Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201.  Issuance of a summons is requested at this time.

## II.
## JURSIDICTION AND VENUE

4.      These matters involve Federal Questions and interpretations of Federal Law.

5.       Venue is proper in this district and division, as the Defendant conducts business in this

and the Plaintiff was employed by Defendant in this District and Division.  *See* 28 U. S.C. A.

§1391 (d).

## III.
## FACTS

6.      Plaintiff worked in various capacities for Defendant in Harris County Texas.

7.      Plaintiff worked for Matheson 4.5 years, beginning October 1st, 2014 as an Account

Manager for the Houston-territory.  Plaintiff excelled quickly at the direction & mentorship of the

excellent manager that hired her, Rick Lauck.  Plaintiff was awarded Rookie of the Year in 2015.

(Also had her in August 2015, and returned to work 30-days after a C-section--to prove

commitment, and minimize time away from work. "2015 Rookie of the Year" was awarded during

1st quarter 2016.)

8.      The Plaintiff's territories were realigned early 2017.  Plaintiff did not have a manager for

most of 2017. But even without a manager, Plaintiff continued to write business, and had steady

commission growth every quarter.   Q1 2017 was Plaintiff's best-ever Quarter at Matheson.

Plaintiff exceeded Q1 in Q2, then exceeded personal best again during Q3 2017.  Plaintiff had

already satisfied about 70% of her annual sales goal, 4-5 months into the fiscal year.  Plaintiff had

just signed two new contracts/ accounts. One, over 100 MM ft. of nitrogen per year.   Plaintiff

completed install projects and negotiated/ renewed for term, Matheson's 3 largest Houston-area

accounts. One of them, the largest bulk account in the country over 600 MM ft. of nitrogen per

year, almost $2 MM in revenue.  Plaintiff's quarterly commission payout was finally on track to

exceed $10k.

9.     A new manager began August 1st, 2017. Don McDaniel came from a competitor.  My team was baffled by his unfamiliarity with our business. He asked to ride with  Plaintiff frequently, but the time was not spent seeing customers. He wanted to meet at Starbucks, and learn how to use his laptop to access & navigate our systems. At one point, Plaintiff taught him how to interpret Defendant's  reporting.

10.     After Don's first 3-weeks of employment, he summoned Plaintiff to a "mandatory meeting." Don would not explain the meeting.  Don said "just show up."

11.     Don indicated Plaintiff was required to meet with him & his manager (Dillan Fernando, VP of Bulk Sales) in a hotel lobby at Hobby Airport. This is the day Hurricane Harvey hit Houston. All other Matheson-employees had been sent home to prepare their homes, and take care of their families.  Houston-plant operations were closed until further notice, and all Matheson transports were removed from the roads across Texas & Louisiana.  All schools were closed, so Plaintiff had to find a babysitter willing to stay. The rain had already started when the meeting began near lunchtime on Fri, Aug 25, 2017. Don was awkward and nervous, but presented Plaintiff with PIP documents.  Shocked & blindsided, Plaintiff asked Don if he was aware of my sales goals. He had to admit, he was not.  The (1st version of their) PIP document was petty & incorrect: One bullet-point stated Plaintiff would not  grant Don's access to view her calendar.  Plaintiff completed this during Don's first week of employment, and even had a confirmation email from Don saying, "I figured it out. I can see your calendar now. Thank you."  Plaintiff declined signing the PIP, but was told the requirements would be enforced anyway.  (There was a ride-along schedule, where Don would be working with Plaintiff multiple days in a week. He did not do this with male-counterparts.  Plaintiff was required to complete additional reporting, male coworkers were not

required to do. It was also required that Plaintiff sign more new business than was required of all male counterparts.)

12.     The following week, (into early September 2017), Plaintiff contacted HR.  When Plaintiff finally connected with HR on the phone, she was rude and short with me.  Plaintiff asked several times for a scheduled call with her. Danielle said she couldn't, because her days were very busy and her schedule was unpredictable.  Plaintiff held the call with HR and the conversation was slanted. Danielle interrupted Plaintiff before she had opportunity to share facts. She indicated she knew all about what Plaintiff was going to say. Our call was short. I did not have much opportunity to speak.  Don used the PIP to justify riding in Plaintiff's truck, while she worked each week. At the end of each day, he would write a lengthy email review of the daily perceived "missteps" (accomplishments omitted) to Dillan and Danielle. Don was so unfamiliar with our process and work objectives, that his interpretations were so inaccurate--almost as if he hadn't really been in the room during the meetings.  Don had not even been to see any male coworkers in Corpus Christi & Austin, who he was also assigned to manage.

13.     April 2018 - Michael Yeargan became new manager. Immediately, the same pattern began AGAIN!  Michael lives in Austin. He would call & request surprise meetings with Plaintiff. Literally, he would drive to Houston early one-morning, call and insist the two meet within the hour.  Plaintiff always complied. Michael did not do this to any male coworkers.

14.     The meetings were hostile and accusatory. He accused Plaintiff of cheating on her commissions, working another job simultaneously, causing a coworker to quit.   Almost immediately, Michael assigned a PIP (July 2018). Again, male coworkers were not experiencing this.  Plaintiff and Michael had a one-on-one meeting, in a hotel lobby in Waller.  Michael told Plaintiff "she would be terminated if my performance didn't improve."   Plaintiff had not been

given individual sales goals. Plaintiff asked Michael how he was benchmarking her performance? To this day, that hasn't been answered.

15.     He attempted to block payment for Plaintiff's commissions that had already been approved. On several occasions, he offered to accept work (negotiated contract terms) from Plaintiff's male coworkers, but said he would not take this same work from Plaintiff.

16.     Eventually, not only Plaintiff's teammates, but employees from other departments would call Plaintiff to tell of disparaging things Michael said about me in a meeting or on a conference call with many participants. Michael made many false statements of fact related to Plaintiff, throughout this company.

17.     August 2018 - It was announced John Molnar, Matheson Sr. Counsel, was promoted to SVP of HR. John gave Plaintiff the courtesy of listening to her story. He recommended an independent 3rd-party investigation. I cooperated fully with the appointed attorney. I spent the next 3-months organizing information and sharing detail and supporting documentation with her, in addition to satisfying my job requirements. One day, we met for about 10-hours straight. It was a tough process. Plaintiff named many coworkers that could/ would support all that she conveyed. No co-workers were consulted them were consulted.

18.     On March, 11, 2019, Plaintiff was terminated via email, by a Matheson HR associate, Danielle Hubbard.

## IV.
## CAUSES OF ACTION

19.     Plaintiff hereby adopts and incorporates by reference the Fact sections above, and alleges the following causes of action and damages against Employer:

**A.     Sexual Harassment**

---

20.     To establish a prima facie case of sexual harassment based on a hostile work environment, a plaintiff must show that (1) he belonged to a protected group, (2) he was subjected to unwelcome sexual harassment, (3) the harassment complained of was based on sex, (4) the harassment complained of affected a "term, condition, or privilege" of employment, and (5) the employer knew or should have known of the harassment and failed to take remedial action.

21.     After Plaintiff, a female, became pregnant and gave birth to her child, Plaintiff was required to exceed the performance of her male counterparts.  Unlike her male co-workers, Plaintiff was excessively disciplined and forced to have significant one on one interaction with male supervisors, who made sexual advances.  The harassment affected Plaintiff's performance, commissions and cause her to be terminated.  Plaintiff repeatedly complained about the sexual harassment, which was dismissed and ignored by Defendant.

**B.      Retaliation**

22.     To establish a retaliation claim a plaintiff must show that (1) he engaged in an activity protected by the TCHRA, (2) an adverse employment action occurred, and (3) there is a causal link between the protected activity and the adverse action.  An employee may prove his retaliation claim with either direct or circumstantial evidence of discriminatory.

23.     Plaintiff complained about the disparate treatment based on her sex.  As a result, she received increasing and unfair discipline not issued to similarly performing male co-workers. Prepared and filed and EEOC complaint.  As a direct and proximate result she was fired with in 24 hours.

**C.      Disparate Treatment**

24.     To make a prima facie case, the plaintiff must "(1) isolate and identify the specific employment practice challenged; (2) demonstrate any observed statistical disparity that the

practice has on the protected class; and (3) demonstrate a causal link between the identified practice and the demonstrated disparity."

25.     Plaintiff was disciplined, had commissions withdrawn and was terminated while exceeding her male co-workers performance.  Male co-workers were not subjected to this treatment.  The disparate treatment proximately caused the Plaintiff's damages.

**D.     All Damages and Punitive Damages**

26.     As a result of the negligent and negligent conduct of Defendants, Plaintiff has suffered actual, backpay, compensatory, out of pocket, liquidated, lost earnings and benefits, compensatory, liquidated damages.  The Plaintiff, also, seeks reinstatement to his former position of employment, prejudgment interest, attorney's fees, costs. and mental anguish.

27.     Defendants are guilty of reckless disregard for the rights of others, have acted intentionally and have engaged in knowing violation of the law and the Plaintiff's rights.  This action is maintained to recover exemplary damages, as those terms are understood in law, because Defendants acted with conscious indifference rights of the Plaintiff.

**V.**
**NOTICE OF DEMAND FOR PRESERVATION OF**
**ELECTRONICALLY STORED INFORMATION**

28.     Intervenors hereby demand that Defendants, their agents, representatives, servants, employees, contractors, independent contractors, corporate parents and subsidiaries, and those acting in concert with the Defendants, preserve all documents, tangible things (including escape packs and other personal equipment), and electronically stored information potentially relevant to the issues in this cause, in accordance with specific notice provisions as if same were set for herein for all purposes.

## VI.
## CONDITIONS PRECEDENT

129.    All conditions precedent to Intervenors' right to recover and Defendants' liability have

been performed or have occurred.

## VII.
## JURY DEMAND

30.    Plaintiff hereby demands a jury trial.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff prays:

1.    That Defendant be cited to appear and answer herein;

2.    That Plaintiff recover all actual and exemplary damages in excess of the
minimum jurisdictional amount of this Court;

3.    That the Plaintiff have their cost, prejudgment interest at the maximum legal
rate and post-judgment interest at the maximum legal rate;

5.    That Plaintiff have trial by jury; and

6.    That Plaintiff have whatever other and further relief at law or in equity to
which they may show themselves justly entitled.

Respectfully submitted,

**BARTON LAW GROUP**

By:    */s/   Wayne D. Collins*
DANIEL P. BARTON
State Bar No.: 00789774
dbarton@bartonlawgroup.com
WAYNE D. COLLINS
State Bar No. 00796384
wcollins@bartonlawgroup.com
1201 Shepherd Drive
Houston, Texas 77007
(713) 227-4747- Telephone
(713) 621-5900 – Fax

---